CITY OF POND CREEK *et al.* v. HASKELL, *Governor et al.*

No. 232.   Opinion Filed August 28, 1908.

(97 Pac. 338.)

1.   **CONSTITUTIONAL LAW—Presumption in Favor of Constitutionality.** A court will never declare an act of legislation, passed with all the forms and solemnities requisite to give it the force of law, unconstitutional and void, unless the nullity and invalidity of the act are placed, in its judgment, beyond a reasonable doubt.

2.   **COUNTIES — County Seat—Location—Change—Legislative Authority.** The constitutional convention, or the people of the state of Oklahoma, either through the Constitution or by legislative enactment, have full power and authority to provide for the location, relocation, or removal of any of the county seats of the state, and to provide the procedure therefor.

3.   **SAME—Constitutional Provision—Self-Executing.** Section 6 of article 17 of the Constitution, providing for the holdng of elections for the relocation or removal of the county seats of the different counties of the state, is self-executing.

4.   **SAME—Statutes Applicable.** A petition praying for the issuance of a proclamation calling a special election for the purpose of submitting to the qualified electors of a county the question of the removal or relocation of the ·county· seat, filed with the Governor prior to April 17, 1908, depends in no particular for its force and validity on Senate Bill No. 234, approved on that date, but upon the provisions of·section 6, art. 17, of the Constitution.

5.   **STATUTES—"Special or Local Law"—County Seat Elections.** An act of the Legislature under which special elections for the relocation or removal of county seats are provided for, the purpose being to secure a permanent location thereof, applicable to all of the counties of the state alike, is not a "special or local law," within the meaning of sections 32, 46, art. 5, of the Constitution.

6.   **SAME — Independent and Amendatory Acts—Enactment—Form.** An act of the Legislature, which is in form original and in itself intelligible and complete, and does not, either in its title or in its body, appear to be revisory or amendatory of any existing law, is not within the inhibiton of secton 57, art. 5, of the Constitution, providing that "no law shall be revised,

City of Pond Creek *et al.* v. Haskell, *Governor*, *et al.*

amended, or the provisions thereof extended or conferred by reference to its title only; but so much thereof as is revised, amended, extended, or conferred shall be re-enacted and published at length"; and this is true, even where such act seeks to effectuate the powers conferred by referring to and requiring the officers provided for thereunder to proceed in the performance of their duties in accordance with general laws previously enacted.

7. ELECTIONS—Registration—Statutes—Validity. Under the provisions of section 6 of article 3 of the Constitution, providing that the Legislature "may when necessary provide by law for the registration of electors throughout the state or in any incorporated city or town thereof," a statute requiring all voters of all cities of the first class to register as a prerequisite condition for exercising their rights of suffrage, is not violative of the fourteenth amendment of the Constitution of the United States or of section 7 of article 3 of the Constitution of the state of Oklahoma, which provides that "the election shall be free and equal."

8. COUNTIES—County Seat—Election Statutes—Constitutionality. An act of the Legislature under which special elections for the relocation or removal of county seats are provided for, the purpose being to secure a permanent location thereof, containing a proviso for the creation of a special election board by appointment by the Governor of the state of "some person, resident of the county, who does not live or reside in either city or town which is a candidate for said honors, and each of said rival towns is to select one person each who shall constitute said election board," and which further provides for the selection and commissioning by the Governor of "one special election commissioner for each voting precinct or voting place in such county," and which disqualifies for such position any person "who shall be, or have been, a resident of such county or who shall be interested in any manner in the success of, any city, town, or place which is a candidate for any such county seat," is not void, but a proper exercise of legislative authority, carrying out the terms of section 6, art. 3, of the Constitution, providing that "the Legislature shall make all such regulations as may be necessary to detect and punish fraud and preserve the purity of the ballot."

(Syllabus by the Court.)

Suit by the city of Pond Creek and others against C. N. Haskell, Governor, and others, to restrain the Governor from canvassing the returns and from declaring the result of an election to determine the removal of the county seat of Grant county from

Pond Creek to Medford, and restrain the county officials during the pendency of the suit from removing their offices, and that the temporary injunction be made perpetual.   On demurrer to the bill.   Sustained.

*Dale & Amidon* and *W. A. Ledbetter,* for plaintiffs.

*C. G. Hornor, Dale & Bierer, B. F. Hegler, Jr.,* and *B. B. Blakeney,* for defendants.

DUNN, J.   This is a suit brought by the city of Pond Creek and others against C. N. Haskell, Governor of the state of Oklahoma, and the county officials of Grant county, Okla., the controversy growing out of an election called on a proclamation issued by the Governor calling an election in the county of Grant, held for the purpose of voting upon the location of the county seat of that county; the leading competitors in the contest being Pond Creek and Medford, which are the only ones interested or involved herein.   The returns of the election showed on their face that Medford received a majority of all of the votes cast, and the city of Pond Creek and the other plaintiffs brought this action for the purpose of securing an injunction restraining the carrying into effect the apparent result of the election.   The averments in the petition material here are:

"That the city of Pond Creek is now, and has been for some 14 years last past, a city of the first class, duly organized and incorporated as such by virtue of the laws of the territory of Oklahoma, now the state of Oklahoma, and that it has been during such time the duly and legally appointed and constituted county seat of Grant county, in said state of Oklahoma, and that it was constituted and appointed such county seat by virtue of the grant of the Congress of the United States of America duly and legally authorizing the same, and that for the purpose of establishing the said county seat of Grant county, in the state of Oklahoma, at Pond Creek, a certain public square was set apart by the government of the United States for the same, and that there has since been erected upon the public square a large courthouse and county jail at a great expense to the said citizens of Grant county, and more especially of the citizens and residents of Pond Creek, and

that during said time and at the present time there has been kept
and maintained at the said courthouse all the public records of
said county, and that the county officers named as defendants
herein have kept and maintained their offices in the said city of
Pond Creek.

"That the above-named plaintiffs, other than the city of Pond
Creek, F. J. Gentry, J. H. Asher, J. A. Alderson, F. L. Patton,
C. M. McCarter, August Diamond, Conrad Strecker, C. S. Watson,
E. E. Darrough, C. E. Foster, C. B. Franke, and L. W. Mc-
Givney, are residents of Pond Creek, in the county of Grant, in
the state of Oklahoma, and were such residents and citizens of
Pond Creek during the times herein mentioned, and were tax-
payers in said city, and paid taxes therein annually in an amount
in excess of $5,000. That if the said county seat be moved from
Pond Creek, as authorized by the election and proceedings herein-
after mentioned, the taxable value of the property situated therein
would be greatly diminished, and said city of Pond Creek would
be greatly damaged and injured thereby in the lessening and re-
duction of the revenues said city of Pond Creek would receive
and is entitled to levy and collect by way of taxation in an amount
in excess of $5,000. That said city of Pond Creek is indebted
in excess of $5,000 and its current expenses exceed the sum of
$5,000 per annum, and if said county seat should be moved there-
from it could not collect sufficient taxes to pay interest on said
indebtedness and the said current expenses, and would as afore-
said be deprived of revenues in excess of $5,000.

"That the amount involved in this controversy, exclusive of
interest and costs, exceeds the sum of $5,000. That Pond Creek
was made the county seat of Grant county by act of Congress ap-
proved March 3, 1893 (section 14, Indian Appropriation Act, 27
Stat. 645), and that the same cannot be changed or removed there-
from by the election and proceedings hereinafter set forth. That
the determination of this controversy involves the construction of
said act of Congress.

"That on or about the 19th day of March, 1908, there was
filed with the Governor of the state of Oklahoma a certain pre-
tended petition for the calling of a county seat election for Grant
county, Okla. A copy of said petition is hereto attached, marked
'Exhibit A,' and made a part hereof. That afterwards, and on
the 19th day of March, 1908, acting upon said alleged petition
and alleged application, the Honorable C. N. Haskell issued a

proclamation calling for the special election to be held on the 27th day of May, 1908, for the purpose of permitting the people of Grant county, Okla., to vote upon their choice for the selection of a county seat of said county. A copy of said proclamation is hereto attached, marked 'Exhibit C,' and made a part hereof.

"Plaintiff alleges that the said petition was illegal, in this: That at the time of the filing of the same there was no law of Oklahoma authorizing the filing of such a petition, and that there was no statute of Oklahoma authorizing the verification as attempted to be attached thereto, or the circulation or filing of the same with the Governor of the state of Oklahoma, and that under said petition the said Governor had no authority and was not authorized to issue a proclamation calling for a special election for the location of a permanent county seat for Grant 'county, Okla., and that said petition nowhere asks for a location of a permanent county seat of Grant county, Okla., or for the purpose of submitting to the qualified electors of said county the question of changing, removing, or locating the county seat of Grant county, Okla. That the said petition was further illegal and void for the reason that the same prayed the Honorable C. N. Haskell, Governor of the state of Oklahoma, to call an election in Grant county, Okla., 'upon the question of changing the location of the county seat of said county from its present location in Pond Creek, in said county of Grant, state of Oklahoma, and locating the said county seat of said county at said election as provided by the law and the Constitution of the state,' and that prior to the issuing of the said proclamation no petition was ever filed with the Governor of the state of Oklahoma asking for a permanent location of the county seat of Grant county, Okla., asking that the question of a permanent location of the county seat be submitted to the qualified electors of Grant county, state of Oklahoma, as provided by the law of the state of Oklahoma and its Constitution.

"Plaintiff further alleges that by reason of said petition as hereinbefore set forth, so attempted and alleged to be filed with said Governor, said proclamation was further illegal and void in this: That the said Governor of the state of Oklahoma had no authority to issue said proclamation and call said election, and that there was no statute of the state of Oklahoma authorizing the calling of said special election by said Governor as attempted to be called by him at said time, and that the issuing and calling

of said election and said proclamation was further illegal in this: That at the time of the said election, to wit, May 27, 1908, the said Governor appointed a special election board of citizens residing outside Grant county, Okla., to have' charge of said election, and that said pretended election so held on May 27, 1908, was conducted by said special election board; that there was no authority of the said Governor to appoint said special election board, and that the appointment of said special election board was illegal, unlawful, and void, and that the same was conducted by the citizens and residents residing outside of Grant county, state of Oklahoma, and was not conducted by the election board of Grant county, or the election board of townships comprising Grant county, as provided by the laws of the state of Oklahoma, and that the election boards of Grant county and of various townships of Grant county were not permitted to conduct said election; that their power was usurped by a special election board appointed by the Governor of the state of Oklahoma, and imported into the said county of Grant and state of Oklahoma for that purpose, and that said board thus appointed by said Governor conducted said election on said May 27, 1908, had charge of the receiving of the ballots and of the counting of the same, and usurped and exercised full control over said board, and that said election so held on said May 27, 1908, was not conducted by election officers authorized by the law of the state of Oklahoma, and that said special election so called by the said Governor was called under the law then in existence on the date of said proclamation, to wit, March 19, 1908, and that the Governor had no authority to have said election held under said law of May 27, 1908.

"Plaintiff alleged that by reason of the said petition as hereinbefore set forth, so attempted and alleged to be filed, said proclamation was illegal and void, and that said proclamation was further illegal and void in this, to wit: That the said Governor of the state of Oklahoma had no authority in law to call said election in this, to wit: That there was no statute of the state of Oklahoma authorizing the calling of said special election by the said Governor as attempted to be called by him at said time. That at the time of the said election, to wit, May 27, 1908, the said Governor appointed a special election board, of citizens residing outside of Grant county, Okla., to have charge of said election, and that said pretended election so held on said May 27, 1908, was conducted by said special election board; that there was no

authority of the said Governor to appoint said special election board, and that the same was conducted by the citizens and residents residing outside of Grant count, state of Oklahoma, and was not conducted by the election board of Grant county, or the election board of townships comprising Grant county, as provided by the laws of the state of Oklahoma, and that the election boards of Grant county and of various townships of Grant county were not permitted to conduct said election; that their power was usurped by a special election board appointed by the Governor of the state of Oklahoma, and imported into the said county of Grant and state of Oklahoma for that purpose, and that said board thus appointed by said Governor conducted said election on said May 27, 1908, had charge of the receiving of the ballots and of the counting of the same, and usurped and exercised full control over said board; and that said election so held on said May 27, 1908, was not conducted by election officers authorized by the law of the state of Oklahoma.

"Plaintiff further alleges that said election so held on said May 27, 1908, was attempted to be held under Senate Bill No. 234, approved by the Governor April 17, 1908, and that said election was called by the said Governor on March 19, 1908, and that by reason thereof said pretended election was illegal and void, and that said election was further illegal and void in this, to wit: That the said Senate Bill No. 234, approved by the Governor on April 17, 1908, and each and every part thereof, is unconstitutional and void in this, to wit: That it is in conflict with the provisions of the Constitution of the state of Oklahoma, to wit, article 5, § 57, which provides: 'Every act of the Legislature shall embrace but one subject, which shall be clearly expressed in its title, except general appropriation bills, general revenue bills, and bills adopting a code, digest, or revision of statutes; and no law shall be revived, amended, or the provisions thereof extended or conferred, by reference to its title only; but so much thereof as is revived, amended, extended, or conferred shall be re-enacted and published at length: Provided, that if any subject be embraced in any act contrary to the provisions of this section, such act shall be void only as to so much of the law as may not be expressed in the title thereof.' That section 3 of said act of April 17, 1908, reads as follows: 'Provided that this section shall not apply to petitions on file with the Governor of the date of the approval of this act'—and that said provision in said section 3 is nowhere

referred to in the title of said act, and that the title to said act nowhere contains any reference to said section 3, and that said act and each and every part thereof, including said section 3, is unconstitutional and void in this: That the law so attempted to be repealed and amended in relation to the county seat elections was not amended, extended, re-enacted, or published at length in said act.

"And plaintiff further alleges that said election is illegal and void in this, to wit: That prior to the act of April 17, 1908, the Constitution of Oklahoma provided that upon the holding of such elections the board of canvassers shall certify and return said votes of said election to said Governor, and that at the time of the calling of the election and the issuing of the proclamation therefor there was no board of canvassers of the state of Oklahoma, and that no board or no person was authorized, directed, or permitted to certify the same to the Governor of the state of Oklahoma. That the said act of April 17, 1908, is unconstitutional and void, and is in violation of article 5, § 32, to wit: 'No special or local law shall be considered by the Legislature until notice of the intended introduction of such bill or bills shall first have been published for four consecutive weeks, in some weekly newspaper, published or of general circulation in the city or county affected by such law, stating in substance the contents thereof, and verified proof of such publication filed with the secretary of state.' Section 46 of the Constitution provides as follows: 'The Legislature shall not, except as otherwise provided in this Constitution, pass any local or special law * * * for the opening and conducting of elections, or fixing or changing the places of voting' —and section 56, as hereinbefore quoted in this petition. That prior to the adoption of said Senate Bill No. 234, approved April 17, 1908, and prior to the consideration of the same, no notice of the intended introduction of said bill was published for four consecutive weeks in any weekly newspaper published or of general circulation in Grant county, Okla., or in the city of Pond Creek, stating the substance and contents of said bill, and that no verified proof of said publication was ever filed with the Secretary of State, as provided by section 32, art. 5, of the Constitution of Oklahoma and that said bill No. 234 was attempted to be adopted and passed by the said Legislature without giving any legal notice thereof, as provided by said section of said Constitution, and that said section as hereinbefore stated was unconstitu-

tional as in contravention of said section 46, art. 5, of said Constitution, in that said bill No. 234 attempted to pass special legislation for the opening and conducting of elections and for fixing and changing the place of elections, and was an act especially adopted for the holding of elections in counties wherein the question of a permanent location of county seats is to be submitted to the qualified electors thereof, regulating the manner of holding the county seat elections. Said law is also repugnant to that portion of section 1 of the said fourteenth amendment to the Constitution of the United States, which prohibits a state from denying any person within its jurisdiction the equal protection of the laws, because said law operates an unjust and unreasonable discrimination against citizens of the United State. Said law is also repugnant to the general spirit of the Constitution of the United States, and fundamental rights of citizens of the United States, which deny to a state the power to attach unreasonable or burdensome conditions, or that curtails the right of suffrage of the citizens of the United States.

"That the said election so held at Grant county, Okla., on May 27, 1908, was further illegal and void in this, to wit: That the sole and only question submitted to the voters by the proclamation of the said Governor so issued on the 17th day of April, 1908, was the following question, to wit: 'The question of changing, removing, or relocating the county seat·of said county'— and that no proclamation was issued by the said Governor for the permanent location of the county seat of Grant county, Okla., and that no vote has ever been had by the qualified voters of Grant count, Okla., for the purpose of locating a permanent county seat of said county.

"That said special election so held on said May 27, 1908, was wholly void and illegal in this, to wit: That there was a discrepancy in the qualification required of the electors in said Grant county by said special election board so appointed by said Governor, which said board conducted said election, and that said discrepancy consisted in this, to wit: That said board refused to permit voters duly authorized to vote at said election, who were residents of Pond Creek, and who were authorized to vote under the Constitution of the state of Oklahoma; that, notwithstanding the qualification of said electors to vote, the said board so appointed by the said Governor refused to permit any residents or electors of Pond Creek to vote on said election who had not registered with

the city clerk, as required by sections 1, 2, 3, and 4, of article 2 of the Session Laws of Oklahoma, 1903, and that said board required that all voters in the city of Pond Creek should have registered as provided by said law, and that all other residents of said Grant county outside of Pond Creek were permitted to vote, notwithstanding they had not registered, and that the said requirements of the said board imposed an additional qualification upon the residents of Pond Creek, and that said additional qualification was illegal and void, and that said law of 1903 hereinbefore quoted was unconstitutional and void, and was in violation of article 3 of the Constitution of the state of Oklahoma, and the various sections of said article 3, and especially section 7 of article 3, which provides 'that the election shall be free, and equal,' and by reason thereof the same test of qualifications were not required of the said electors of the city of Pond Creek as were required of the balance of the electors in said county of Grant, and that by reason thereof many of the electors of Pond Creek were disfranchised, and that, had the said board required only the same test of qualification for the electors of Pond Creek as were required of the electors of the balance of the county, the said election would not have been in favor of Medford, but would have been in favor of Pond Creek, and that the result of the said election would have been different, and that the said test of qualification of electors so required by the board disfranchised enough of electors of Pond Creek to have made the result of said election different.    That said sections 1, 2, 3, and 4 of article 2, c. 13, of the 1903 Session Laws of Oklahoma are repugnant to that portion of section 1 of the fourteenth amendment of the Constitution of the United States, which declares that 'nor [shall any state] deny to any person within its jurisdiction the equal protection of the laws,' for the reason that the same deprives the citizens of the United States residing in the city of Pond Creek of their right to vote.    That said law is also repugnant to the general spirt of the Constitution of the United States and the fundamental rights of citizens of the United States, which deny to a state the power to attach unreasonable or burdensome conditions to the free movement of citizens of the United States out of, into, and settlement within the confines of any state, district, or territory within the United States, for the reason that the same deprives the citizens of the United States residing in the city of Pond Creek of their right of the equal protection of the laws,

and imposes on the citizens of said city unconstitutional restrictions as preliminary to their right to vote, and that by reason whereof your petitioners and each of them have been denied a right guaranteed by the federal Constitution.

"That the said election so held at Grant county, Okla., on the 27th day of May, 1908, was further illegal and void in this, to wit: That the ballot as used at said election obligating the voter to vote upon the question of relocating the county seat of Grant county, was printed upon white paper, one of which ballots is hereto attached, marked 'Exhibit D,' and made a part hereof; that the same was not in conformity with section 24, c. 33, of the Session Laws of Oklahoma, which provides, *inter alia*, that 'all ballots prepared by the territorial board of election commissioners shall be printed on red paper'; and, further, that the said ballot curtailed, limited, and illegally defined the proposition voted upon in this, to wit: That said ballot contained the printed statement, 'For the purpose of relocating county seat of Grant county, Oklahoma', and whereas, under the terms of the proclamation issued by the Governor of the state of Oklahoma, the question submitted to the qualified electors of said county was 'the question of changing, removing, or relocating the county seat of said county,' a copy of which proclamation is hereto attached, marked 'Exhibit E,' and made a part hereof, and that by reason of these premises the citizens of said Grant county and your petitioners and each of them were limited, curtailed, and misled in the exercises of the right of franchise; and, further, that the said ballot proclaiming the purpose of said election is in violation of Senate Bill No. 234, approved April 17, 1908, in this, to wit: That by the terms of said bill the question to be submitted to the electors was the question of a permanent location of a county seat, and not, as in said ballot provided, for the purpose of relocating the county seat, and that by reason of these premises the citizens of Grant county, and your petitioners, and each of them, were limited, curtailed, and misled in the exercises of the right of franchise, as provided by the laws of the state of Oklahoma, and section 1 of article 14 of amendments to the Constitution of the United States, which declares that 'no state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States,' for the reason that the form of said ballot abridges the privileges and immunities of the citizens of the United States residing in the city of Pond Creek, and imposed

on citizens of said city unconstitutional limitations, preliminary to their right to vote.

"That in pursuance of the said proclamation of the said Governor C. N. Haskell of the state of Oklahoma, as herein set forth, there was an election held in Grant county, Okla., on said 27th day of May, 1908, which was conducted by the said election board, appointed by the said Governor as hereinbefore set forth, at which said election the town of Medford, Grant county, Okla., and Jefferson, and the city of Pond Creek were candidates for the election of said county seat, at which said election said board hereinbefore appointed by said Governor claimed that the town of Medford received a majority of the votes cast at said special election, and that said election commissioners are about to return said certificates of election and said ballot boxes and affidavits, and proceed at once to the Governor of the state of Oklahoma, C. N. Haskell, and deliver said ballots and said affidavits to the said Governor, and the said C. N. Haskell is about forthwith to canvass said election, and is about to declare the result of said election in favor of the town of Medford, and is about to order and direct the said defendant officers of Grant county hereinbefore mentioned to remove their offices to the town of Medford and to direct them to take the records of the said county of Grant from Pond Creek to the town of Medford, and that the defendant officers of Grant county are about to remove their said offices from Pond Creek to the town of Medford, and are about to take their records and the records of said county from the city of Pond Creek to the town of Medford, and that the said town of Medford has never, by vote or otherwise, been declared to the the permanent county seat of Grant county. That the said plaintiffs have no adequate remedy at law, and that the said defendants are about to perform the acts set forth against them in this petition unless enjoined and restrained from so doing."

Exhibit C:

"Proclamation. To All Whom It may Concern: Whereas, there was on the 19th day of March, A. D. 1908, filed with the Governor of the state of Oklahoma petitions in writing signed by twenty-five per centum of the qualified electors of the county of Grant, such per centum having been determined by the total vote cast in said county for the head of the state ticket in the next preceding general election, said petition being verified by an

affidavit showing that the petitioners are qualified electors of the said county of Grant, state of Oklahoma, said petitions being addressed to the Governor of the state of Oklahoma, and praying that a proclamation issue calling an election under the provisions of section 6 of article 17 of the Constitution of the state of Oklahoma to be held in said county of Grant, for the purpose of submitting to the qualified electors of said county the question of changing, removing, or relocating the county seat of said county; and whereas, said petitions have been examined by me, and the same being in proper form and in conformity to law, and being fuly advised in the premises; Now, therefore, I, C. N. Haskell, Governor of the state of Oklahoma, by virtue of the authority vested in me by the laws of the state of Oklahoma, do hereby issue this my proclamation calling an election to be held in said county of Grant for the purpose of submitting to the qualified electors of said county the question of changing, removing, or relocating the county seat of said county; that said election shall be held under the election laws of the state of Oklahoma on the 27th day of May, 1908; that public notice of said election shall be given by publishing this proclamation in at least three newspapers of general circulation published in said county of Grant for at least four consecutive weeks preceding the date of holding of said election; and in order that the greatest publicity of said proclamation may be given, same may be published in one newspaper of general circulation in each of the incorporated towns having a newspaper published therein, in said county of Grant, for the time and in the manner above provided, but the publication in said three newspapers first provided shall constitute sufficient publication in case of failure of other newspapers herein provided to so publish said proclamation. In witness whereof, I C. N. Haskell, Governor of the state of Oklahoma, have hereunto set my hand and caused the official seal of said state to be hereunto affixed this 19th day of March, A. D. 1908.                                  C. N. HASKELL,

                    "Governor of the State of Oklahoma.
"Attest:  BILL CROSS, [Seal]
              "Secretary of the State of Oklahoma."

Thereupon plaintiffs prayed for a temporary injunction against C. N. Haskell, Governor of the state of Oklahoma, restraining him from canvassing said returns, and from declaring the result of said election, and from directly or indirectly ordering or

causing to be ordered the county officers to remove their records, books, etc., of Grant county from Pond Creek to Medford, and restraining all of the county officials, during the pendency of this suit, from removing their offices from Pond Creek to the town of Medford, and asking that upon the final trial the temporary injunction be made perpetual. To this petition the defendants filed demurrer, in which is raised generally the question of the sufficiency of the averments contained in the petition to state facts sufficient to constitute a cause of action. The propositions raised have been argued both orally and in brief by able counsel on both sides, and on June 29, 1908, in open court, an oral opinion was rendered sustaining the demurrer to the petition, and it now remains for us to set out at length and in detail our reasons for such judgment.

It will be observed that the foregoing petition seeks to restrain the defendants from carrying into effect the apparent result of the election by reason of an alleged lack of authority in the state or the officials of Oklahoma to provide for or to call or hold such an election for the purpose sought, or to conduct it in the manner it was held. No better method of taking note of the propositions raised and argued presents itself than by setting out at length the propositions as laid down in plaintiff's brief, which are as follows:

"First: That the Governor of the state of Oklahoma had no authority and was not authorized to issue a proclamation calling for a special election for the purpose of voting on the question of changing, removing, or relocating the county seat of Grant county. (a) The act of Congress of March 3, 1893, designated the permanent county seat of Grant county. (b) At the time of the issuance of the election proclamation no law was in force to carry out the executive mandate. Second: That the election held in Grant county, Okla., on the 27th day of May, A. D. 1908, was without authority in law. (a) It was held under an act the subject of which was not clearly expressed in its title. (b) It was held under an act re-enacted and not published at length. (c) It was held under an act violating the constitutional restriction in reference to special legislation. (d) It was held under an act

not in conformity with the constitutional requirement in reference to special or local laws. (e) It was not held in conformity with the purpose expressed in the executive proclamation. (f) It was held under an act of the Legislature passed for purposes other than those for which the election was called. Third: That the method, mode, and manner of conducting the county seat election held in Grant county, Okla., on the 27th day of May, 1908, was illegal and void and in conflict with the laws of the state of Oklahoma and the fourteenth amendment of the Constitution of the United States."

These propositions will be discussed in the order set out.

It is first contended that "the act of Congress of March 3, 1893, designated the permanent county seat of Grant county." Under this head counsel calls our attention to the act of Congress of March 3, 1893 (27 Stat. 645, c. 209), opening the Cherokee Outlet to settlement, and the President's proclamation issued therunder, which contains the following provisions:

"Whereas, the lands acquired by the three several agreements hereinbefore mentioned have been divided into counties by the Secretary of the Interior, as required by said last-mentioned act of Congress, before the same shall be opened to settlement, and lands have been reserved for county seat purposes to be entered under sections twenty-three hundred and eighty-seven and twenty-eight hundred and eighty-eight of the Revised Statutes of the United States as therein required as follows, to wit: * * * For county L, the southwest quarter of section one, and the southeast quarter of section two, township twenty-five north of range six west of the Indian Meredian, excepting four acres reserved for the site of a courthouse to be designated by lot and block upon the official plat of survey of said reservation for county seat purposes hereafter to be issued by the Commissioner of the General Land Office; said reservation to be additional to the reservations for parks, schools and other public purposes required to be made by section 22 of the act of May 2, 1890." (28 Stat. pp. 1225, 1226.)

The county L mentioned therein is now Grant county, and the reservation made is the land on which Pond Creek has subsequently been built, and which has been used for county seat purposes to this time. .

Counsel also calls our attention to the act of Congress opening original Oklahoma to settlement, which contains no provision for counties or for the location of county seats, and to section 4 of the organic act of the territory, passed subsequently thereto, which provided for the division of the territory into seven counties and established the county seats thereof, with the provision that "the county seats located by this act may be changed in such manner as the territorial Legislature shall provide." Act May 2, 1890, c. 182, 26 Stat. 83. From this it is argued that it was the intention of Congress to locate permanently the county seats of the counties in the Cherokee Outlet, and that this intention was made manifest by the fact that, while a provision was made authorizing the change of the location of the county seats of original Oklahoma, there was no such provision in the act establishing and locating the county seats of the counties of the Cherokee Outlet, among which was Pond Creek, in Grant county, and that the original location was permanent, and not subject to being changed either by authority of the territory or of the state formed out of it. In support of this contention we are cited to a number of decisions from the Supreme Court of the United States dealing with jurisdictional questions, wherein generally the right of the federal government to legislate exclusively for interstate commerce and its control of navigable waters in and near the nation were drawn into question; but these we do not believe announce principles controlling here or which aid us much. In addition thereto we are cited to the case of *St. Joseph & Denver City Railroad Company v. Baldwin;* 103 U. S. 426, 26 L. Ed. 578, and to the case of *Allen et al. v. Reed, et al.,* 10 Okla. 105, 60 Pac. 782, 63 Pac. 867, in the latter of which the court asserts the general rule covering the authority and jurisdiction of Congress to legislate for the territories of the Union in the following language:

"The Congress has plenary legislative power over the people of the territories and of the departments of the territorial government. Subject to the limitations expressly or by implication im-

posed by the Constitution, the Congress has full and complete authority over a territory, and may directly legislate for the government thereof. It has the power to declare a valid law of the territorial Legislature void, and a void law valid, regardless of the fact that no such power is expressly or impliedly reserved in the organic act."

The case of *Railroad Company v. Baldwin, supra,* from the Supreme Court of the United States, was one wherein Congress, in July, 1866, granted to the state of Kansas, for the benefit of a Kansas corporation, the right of way over certain public lands in that state and in Nebraska. Thereafter, and prior to the location of the road, the defendant in error entered a tract of land, which was subsequently crossed in the construction of this railroad, which Baldwin sued for damages. The district and supreme courts of Nebraska rendered judgment in his favor, which was reversed by the Supreme Court of the United States, which held under this state of facts that, "where Congress has conferred upon a railroad corporation, organized under the laws of a state, the right of way over the public lands of the United States in any one of their territories, it may be doubted whether the state subsequently created out of the territory could prevent the enjoyment by such corporation of the right conferred." It will be noted that from this conclusion Mr. Chief Justice Waite and Mr. Justice Miller dissented. But we believe that the statement of the case is sufficient to show that the principle enunciated could scarely be held applicable and controlling in the condition presented by the facts in the case at bar. The action on the part of the government in endowing the railroad company with the right of way across lands owned by it in the territory doubtless induced the corporation to begin to construct its line of road, and when the state was organized out of the territory across which this right of way had been granted we believe it should have been compelled to recognize this prior right, and "that it may be doubted whether the state in fact ought to be permitted to refuse to recognize it."

But can the condition presented in that case be said to be

parallel to a case where the government, in the opening of an un-populated territory to settlement, and for the better convenience of the people invited to enter, reserves a tract of land, which is now used as a county seat of one of the counties created by it? This latter was an act relating solely to the public, and we cannot see how any private vested rights can be predicated upon it. Whether the territorial Legislature could lawfully pass an act under which the people could change the county seat established by such author-ity is not before us. There is no doubt of the authority of Con-gress to legislate for a territory, nor that its power is plenary; that it can legislate for it alone, and in its entirety, or can delegate to a territorial body the power of legislation. Nor do we doubt, if the act of Congress and the proclamation cited would bear the con-struction that it was the intention of Congress to thus permanently locate the county seat of Grant county at Pond Creek, it would have been beyond the power of the territorial Legislature to have pro-vided any legal method for changing it. But Congress, while pos-sessing the constitutional power to legislate for territories in refer-ence to their domestic affairs, political and otherwise, has such power only to legislate for the people residing in the states as is granted to it in the federal Constitution, or such implied power as is necessary to carry out the powers granted. The formation of counties and other subdivisions of a state, and the location of coun-ty seats therein, and the regulation by the people of these matters, are all peculiarly the functions of a state government. They are not within the powers granted by the people to the federal govern-ment, and the right to the exercise of such power is not necessary to carry out any of the authority granted.

On June 16, 1906, Congress passed what is commonly known as an "enabling act" (Act June 16, 1906, c. 3335, 34 Stat. 267), which, among other things, was a provision for the organization of the state of Oklahoma. It provided for the formation of a Con-stitution and state government, with the limitation, material here, that the Constitution "shall be republican in form, and make no distinction in civil or political rights on account of race or color,

and shall not be repugnant to the Constitution of the United States and the principles of the Declaration of Independence." While the constitutional convention provided for therein was in session and engaged in its duty of framing such state government, it divided the territory composing the state into counties. To restrain such action an injunction suit was brought in the district court of Woods county, in which it was sought to enjoin the Governor of the territory and the officers .of the constitutional convention and others from issuing or publishing any proclamation or proceeding in any way· for the submission to the electors of the proposed state of Oklahoma of a joint or a separate ordinance for the division of Woods county. This suit was sustained in the district court, where brought, but the holding was reversed on appeal. *Frantz et al. v. Autry*, 18 Okla. 561, 91 Pac. 193. In reference to the powers of the constitutional convention the Supreme Court of the territory said:

"The convention has, and can exercise, plenary powers, subject to the limitations and restrictions that the Constitution shall be republican in form, that it shall not be repugnant to the Constitution of the United States and the principles of the Declaration of Independence, that no distinction shall be made on account of race or color, and that the convention shall by ordinance irrevocable accept all the terms and conditions in the enabling act. The power vested in the convention to form a state government clearly implies the power to create and define all the counties within the limits of the proposed state; the only limitation upon the convention in this respect being that the Osage Indian reservation shall remain a separate county until the lands therein are allotted in severalty, and until changed by the Legislature of the state. A 'county' is one of the territorial divisions of the state, created for public and political purposes connected with the administration of the state government."

Under the holding and reasoning of this authority we believe there can be no doubt of the plenary power of the constitutional convention and of the people of the state of Oklahoma to provide, as they did in the Constitution (section 6 of article 17, under the title of "Counties"), for the change, removal, or relocation of the

county seats by the qualified electors residing in any of the counties, and to provide for the procedure. We therefore hold, in accordance with the terms of the Constitution, that the Governor of the state of Oklahoma was authorized to issue the proclamation mentioned, calling the special election involved herein for the purpose of voting on the question of changing, removing, or relocating the county seat of Grant county; for, clearly, if the convention could change and alter county lines established in the territory under authority of an act of Congress, the power existed in the convention to provide for a submission to the people of a county the question of where the county seat should be located even though it also had during territorial days been fixed in a similar way.

Under the second subdivision of the first paragraph counsel contends that "at the time of the issuance of the election proclamation no law was in force to carry out the executive mandate." It will be seen from the petition that the proclamation issued by the Governor in this case, calling the election, was issued on the 19th day of March, 1908, and it will be further observed that on that date the law providing for the calling of an election for the purpose of changing or relocating a county seat was contained in section 6 of article 17 of the Constitution, which, so far as is relevant here, is as follows:

"Upon a petition or petitions in writing, signed by twenty-five per centum of the qualified electors of the county, such per centum to be determined by the total vote cast in such county for the head of the state ticket in the next preceding general election, said petition or petitions being verified by an affidavit showing that the petitioners are qualified electors of said county and such petition or petitions having been filed with the Governor at any time after four months after the admission of the state into the Union, the Governor shall within thirty days issue his proclamation calling an election to be held in such county not less than sixty nor more than seventy days from the date of his proclamation. Such election shall be held under the provisions of the election laws of the state, and upon such public notice of such election as the Governor in his proclamation may direct; and the Governor shall cause

to be placed upon the tickets to be voted at such election, only the names of such towns as may, more than twenty days prior to such election, file with the Governor verified petitions therefor, as above mentioned, signed by not less than three hundred qualified electors of said county. Upon the holding of any such election the board of canvassers shall certify and return said vote to the Governor, who shall thereupon at once declare the result and cause the will of the electors to be carried into effect."

It is contended that these provisions of the Constitution are not self-executing, by reason of the fact that it is provided that, "upon the holding of any such election, the board of canvassers shall certify and return said vote to the Governor," without providing for any such board or the manner of carrying out its duties. It will be noted that the ballance of that sentence is as follows: "Who [the Governor] shall thereupon at once declare the result and cause the will of the electors to be carried into effect." It will also be noted that this same section contains the provision that "such election shall be held under the provisions of the election laws of the state." Section 2 of the schedule provides:

"All laws in force in the territory of Oklahoma at the time of the admission of the state into the Union, which are not repugnant to this Constitution, and which are not locally inapplicable, shall be extended to and remain in force in the state of Oklahoma until they expire by their own limitation or are altered or repealed by law."

Under the laws of the territory extended in force is section 6, c. 17, p. 235, of the Session Laws of the territory for the year 1905, entitled "Elections," which, referring to the precinct election board, requires it immediately upon closing the polls to proceed to canvass the votes, setting out in detail the manner and procedure of making the canvass, and of recording the same. It then provides (section 8):

"On completing the canvass and recording same on the tally sheets and executing the certificates, all of the ballots counted and one certificate, one poll book, and one tally sheet shall be securely sealed in a stout paper or muslin envelop or bag, with the names of the election board written across the seal of the package. Said

package, together with the sealed package containing mutilated ballots, and the other poll book, tally sheet and certificate unsealed, shall with the ballot box be returned to the county clerk by the inspector or one of the judges designated by him within two days after the holding of such election."

The statutes further provide that the board of county commissioners shall constitute a board of canvassers, and section 63, c. 33 (section 2968), Wilson's Rev. & Ann. St. Okla. 1903, provides that on Friday following the election the county clerk and the commissioners of the county shall proceed to canvass the several returns which have been made to that office, etc. The laws which, under the schedule, are extended to and are to remain in force in the state, are such only as are not repugnant to the Constitution or not wholly inapplicable. The provision. "upon the holding of any such election, the board of canvassers shall certify and return said vote to the Governor, who shall thereupon at once declare the result and cause the will of the electors to be carried into effect," renders that portion of the general election law which constitutes the board of county commissioners a final canvassing board inapplicable and repugnant, and the Governor is thereby made to stand in the place of the county commisioners, and it is made the duty of the precinct board of canvassers to certify the returns to the Governor, just as it had previously been its duty to certify and make return to the board of county commissioners.

The point is made that the Constitution cannot be self-executing in this regard, for the reason that there is no procedure provided for under which the board of canvassers referred to may make their return. The general election law above referred to provided simply that the records "shall be returned to the county clerk by the inspector, or one of the judges designated by him, within two days after the holding of such election." This is substantially the law as it existed prior to the amendment contained in the Laws of 1905, which was in force and in operation in the territory long prior to the adoption of the Constitution. It was sufficient under which to hold the elections of the territory. The provision of the

Constitution required of the same officials, or officials performing the same duties, practically the same things, and we see no reason for not holding that it likewise is sufficient to execute itself. Furthermore, when the time to act under it had arrived, Senate Bill No. 234 had been enacted, which supplemented the Constitution in this regard by providing definite procedure; and counsel in their petition plead that: "Said election commissioners are about to return said certificates of election and said ballot boxes and affidavits, and proceed at once to the Governor of the state of Oklahoma, C. N. Haskell, and deliver said ballots and said affidavits to the said Governor, and the said C. N. Haskell is about forthwith to canvass said election, and is about to declare the result of said election in favor of the town of Medford," etc. From this it will be seen that there was no question but that the law and its provisions and intentions were about to be carried out, even though the Constitution placed the specific duty of making the actual manual delivery of such returns and ballots upon no one; and, while the constitutional provision is self-executing, it was entirely appropriate for the Legislature to make specific provisions to supplement it, as was done in the case at bar.

Under the second assignment counsel urges: "That the election held in Grant county, Okla., on the 27th day of May, A. D. 1908, was without authority in law. (a) It was held under an act the subject of which was not clearly expressed in its title." The petition under which this election was called was filed on March 19, 1908, and the proceedings instituted under section 6 of article 17 of the Constitution. After the filing of this petition, and on April 17, 1908, the Governor approved Senate Bill No. 234, which was entitled "An act providing for the appointment of special election commissioners to supervise the holding of elections in counties wherein the question of a permanent location of a county seat is to be submitted to the qualified electors thereof; regulating the manner and procedure of holding such elections; canvassing the returns and declaring the result therein; and declaring an emergency." This was one of the acts of the first Legislature of the

state of Oklahoma, intended and calculated to supplement and assist in carrying out the provisions of section 6 of article 17 of the Constitution relating to the holding of elections in the different counties of the state for the purpose of locating the permanent county seats therein. We are now called on to say that this act is unconstitutional by reason of the fact that it is in conflict with section 57 of article 5 of the Constitution of the state of Oklahoma, which provides that "every act of the Legislature shall embrace but one subject, which shall be clearly expressed in its title." This brings us into that domain of the law where rule, precedent, and authority may be found in abundance to support almost any reasonable theory which may be urged. This uncertainty in the administration of this branch of the law is inherent, and will probably never be eradicated. It is due to the fact that there is no exact rule by which, with unvarying accuracy and exactness, the meaning of language may be measured, and, if there was, there are no unvarying men to exercise it. Mr. Sutherland, the acknowledged standard authority on the subject of the construction of our written laws, in the preface to the first edition of his work on this subject, recognizes just the condition which we have here mentioned, and, speaking of the uncertainty and lack of well-defined lines, says:

"The law for the construction of written contracts and other private documents is as certain and well-defined as upon any other branch of legal science. This is not equally true of the law for the construction of written laws. They deal with subjects of greater complexity. They are the product of so many minds, not having common views, that incongruities cannot be wholly excluded, and threads of diverse ideas are often interwoven; and, moreover, opposing considerations of broader range press for recognition in their construction. In many ways converse rules overlap, and the lines of distinction are faint and shifting."

This fact accounts to a great extent for the ability of vigilant counsel to cite point and precedent to support any reasonably tenable position when a section of either statute or Constitution is presented for construction.

There is one rule, however, not controverted by counsel and which appears to be recognized with absolute universality, and that is that, when an act of the Legislature is assailed on the ground that it is repugnant to the Constitution of the state or nation, it is never stricken down, except that it be shown to be unconstitutional beyond a reasonable doubt. Mr. Chief Justice Shaw, speaking for the Supreme Court of the state of Massachusetts in the case of *Wellington et al. v. Petitioners,* 16 Pick. 87, 26 Am. Dec. 631, says:

"When called upon to pronounce the invalidity of an act of legislation passed with all the forms and solemnities requisite to give it the force of law, courts will approach the question with great caution, examine it in every possible aspect, and ponder upon it as long as deliberation and patient attention can throw any new light on the subject, and never declare a statute void unless the nullity and invalidity of the act are placed, in their judgment, beyond reasonable doubt."

Mr. Chief Justice Peck, speaking for the Supreme Court of the state of Alabama in the case of *Falconer v. Robinson,* 46 Ala. 340, says:

"In considering the question of the constitutionality of an act of the Legislature, the presumption is in favor of the validity of the act, and it is not to be declared void upon a mere conflict of interpretation between the legislative and the judicial power. Before proceeding to annul by judicial sentence what has been enacted by the lawmaking power, it should clearly appear that the act cannot be supported by any reasonable intendment or allowable presumption. Cooley's Con. Lim. 105; *People v. Supervisors of Orange,* 17 N. Y. 241. The rule is that in the exposition of a statute it is the duty of the court to seek to ascertain and carry out the intention of the Legislature in its enactment, and to give full effect to such intention; and they are bound so to construe the statute, if practicable, as to give it force and validity, rather than to avoid it and render it nugatory. *Clark v. Rochester,* 24 Barb. (N. Y.) 471; Cooley, 186. If, after a careful examination, there is a reasonable doubt in the mind of the court, it is its duty to hold the statute to be constitutional. Cooley, 182, and notes 2 and 3."

Chief Justice Brickwell, of the same court, in the case of

*State ex rel., etc., v. Rogers el al,* found in 107 Ala. 444, 19 South. · 909, 32 L. R. A. 520, says:

"The presumption is that the Legislature has not exceeded its powers, and, unless it be clear that there has been a substantial departure from the Constitution, the validity of the legislative act must be supported."

On approaching for consideration the real question presented, and scanning the title of the bill in question in connection with its contents, we find that we have another rule well recognized by the courts to assist us, which grows out of a recognition of the purpose and the reason for the existence of the constitutional provision that each act of the Legislature shall embrace but one subject, which shall be clearly expressed in its title. Mr. Justice Mason, of the Supreme Court of Maryland, in the case of *Davis v. State,* 7 Md. 151, 61 Am. Dec. 331, states the same as follows: ·

"A practice had crept into our system of legislation of engrafting upon subjects of great public benefit and importance, for local or selfish purposes, foreign and often pernicious matters, and rather than endanger the main subject, or for the purpose of securing ,new strength for it, members were often induced to sanction and actually vote for such provisions, which, if they were offered as independent subjects, would never have received their support. In this way the people of our state have been frequently inflicted with evil and injurious legislation. Besides, foreign matter has often been steathily incorporated into a law, during the haste and confusion always incident upon the close of the sessions of all legislative bodies, and it has not unfrequently happened that in this way the statute books have shown the existence of enactments that few of the members of the Legislature knew anything of before. To remedy such and similar evils was this provision inserted into the Constitution, and we think wisely inserted."

To the same effect speaks the Supreme Court of Michigan, in the case of *People v. Mahaney,* 13 Mich. 481, the opinion in which was written by Mr. Justice Cooley, and is as follows:

"The history and purpose of this constitutional provision are too well understood to require any elucidation at our hands. The practice of bringing together into one bill subjects diverse in their

nature and having no necessary connection, with a view to combine in their favor the advocates of all, and thus secure the passage of several measures, no one of which could succeed upon its own merits, was one both corruptive of the legislator and dangerous to the state. It was scarcely more so, however, than another practice, also intended to be remedied by this provision, by which, through dextrous management, clauses were inserted in bills of which the titles gave no intimation, and their passage secured through legislative bodies whose members were not generally aware of their intention and effect. There was no design by this clause to embarrass legislation by making laws unnecessarily restrictive in their scope and operation, and thus multiplying their number; but the framers of the Constitution meant to put an end to legislation of the vicious character referred to, which was little less than a fraud upon the public, and to require that in every case the proposed measure should stand upon its own merits, and that the Legislature should be fairly notified of its design when required to pass upon it. See *Board of Supervisors v. Heenan,* 2 Minn. 336 (Gil. 281). But this purpose is fully accomplished when the law has but one general object, which is fairly indicated by its title. To require that every end and means necessary to the accomplishment of this general object should be provided for by a separate act relating to that alone would not only be senseless, but would actually render legislation impossible."

In the syllabus of the case it is held:

"The provision of the Constitution (section 20, art. 4) that 'no law shall embrace more than one object, which shall be expressed in its title,' was designed to prevent, first, the joining in the same bill of subjects diverse in their natures and having no necessary connection; and, second, the insertion of clauses in a bill of which the title gives no intimation."

To the same effect is the holding of the Supreme Court of the state of Kansas in the case of *Division of Howard County,* 15 Kan. 194:

"The 'subject' to be contained in a bill, under section 16, art 2, of the Constitution, which provides that 'no bill shall contain more than one subject, which shall be clearly expressed in its title,' may be as broad and comprehensive as the Legislature may choose to make it. It may include innumerable minor subjects,

provided all these minor subjects are capable of being so combined as to form only one grand and comprehensive subject; and, if the title to the bill containing this grand and comprehensive subject is also comprehensive enough to include all those minor subjects as one subject, the bill, and all parts thereof, will be valid."

The title of the act in that case, and which was held by the court to state but one subject, was as follows:

"An act to divide the county of Howard, and to erect the territory thereof into the counties of Chautauqua and Elk, to provide for the due organization of said counties, the filling of vacancies in offices, for the proper division of the property and indebtedness of Howard county, and in regard to the taxes and records thereof."

It can be readily understood how a strict construction placed upon this provision of the Constitution would require the separation of nearly all articles and chapters as they now appear in the Statutes into numbers of separate and individual ones, and this in many instances where the law in fact related to but one subject. This was recognized in our Constitution, and revenue and other extended comprehensive measures of that character were excepted from its operation. The courts do not hold this separation to be necessary, but view the subject from a reasonable standpoint, and generally very much as is indicated by two decisions from the Supreme Court of Alabama, to which attention is here called. The Supreme Court of that state, in the case of *Ballentyne v. Wickersham,* 75 Ala. 533, in discussing this proposition held as follows:

"The provision of section 2, art. 4, of the Constitution of this state, ordaining that 'each law shall contain but one subject, which shall be clearly expressed in the title,' is mandatory; but its requirements are not to be exactingly enforced, or in such manner as to cripple legislation. Under this clause of the Constitution, the title of a bill may be very general, and need not specify every clause in the statute, it being sufficient if they are all referable and cognate to the subject expressed; and when the subject is expressed in general terms everything which is neces-

sary to make a complete enactment in regard to· it, or which results as a complement of the thought contained in the general expression, is included in and authorized by it. But, if clauses are contained in the act which are not so correlated to the subject expressed in the title as to appear to follow as a natural and legitimate complement, they cannot stand."

And in the case of *State ex rel. Earp et al. v. McCary et al.,* 128 Ala. 139, 30 South. 641, speaking through Mr. Justice Tyson, the court held as follows:

"In the application of this rule we must be careful not to unduly cripple or embarrass legislation. It is, therefore, not essential that the title shall define or disclose the subject with precise accuracy. 'It is enough if the subject be one, and that the title so express that subject as that the reader will readily understand the several provisions of the enactment as being embraced in or referable to that subject.' *Boyd v. State,* 53 Ala. 606; *Adler v. State,* 55 Ala. 21."

The syllabus of the case is instructive, in that it sets forth the title of the act and the material portion of its contents, and is as follows:

"The statute (Acts 1898-99, p. 129), entitled 'An act to provide the manner of selecting the police force of the city of Birmingham and to provide for the efficient management of the police force of said city,' which declares that the board of commissioners to select the police force shall consist of seven, instead of five, members, as originally constituted, that said board shall be elected by the people, instead of appointed by the Governor, as provided in a former act, and which prescribes the terms of office of each member of the board, the time for their election, and the manner of filling vacancies, etc., is not violative of section 2, art. 4 of the Constitution of 1875, declaring that 'each law shall contain but one subject which shall be clearly expressed in its title.' "

Now, with these rules in view, that no act of the Legislature shall be stricken down as unconstitutional, except where plain duty requires it and where it is shown beyond a reasonable doubt to be repugnant to the provisions of the organic law, and keeping in mind the object and purpose to be accomplished by the provision, which restricts each act of the Legislature to one sub-

ject, and that to be clearly expressed in its title, and the rule as laid down that the subject be one and the title so expressed that the reader may readily understand the several provisions of the enactment, to be properly embraced in, cognate to, or referable to that subject, and waiving for this discussion the self-executing character of the constitutional provision called into operation by the election, we come to the consideration of the title of the bill before us and the alleged repugnant provisions to which our attention is called in the brief of counsel. The particular portion of the act to which objection is made is found in section 3, which reads as follows:

"The following shall be substantially the form for every petition filed with the Governor, asking such special election to be held as provided herein: Provided, that this section shall not apply to petitions on file with the Governor on the date of the approval of this act: 'To the Governor of the State of Oklahoma: We, the undersigned qualified electors of ——— county, state of Oklahoma, hereby petition the Governor of said state to call an election to relocate the county seat of said county under the provisions of section 6, art. 17, of the Constitution.'"

It will be noted that this section is merely directory in form, for the purpose of carrying out the provisions of section 6, art. 17, of the Constitution, and the proviso, "that this section shall not apply to petitions on file with the Governor on the date of the approval of this act," is the particular portion of the act which petitioners state is not properly within the scope of the title. Further objection is urged to this section that it is retroactive, in that it deals with the past and that which has taken place, as well as the future. In our judgment this portion of section 3 is not of the character charged, for it simply excepts from the operation of the directory portion of the bill petitions then on file, which were yet to be acted on and made effectual by the terms of the bill itself. The section of the Constitution to which reference is made, as we have seen, is self-executing—that is, it is a law complete within itself, under which the election in this case could have been held; and a petition filed, as was the petition in the case

at bar, under its provisions, was valid and sufficient under which
to have called the election, without any aid whatsoever from the
act in question.   If the proviso mentioned had not been incor-
porated within this act, or had the act itself not been passed,
the election under such petition could in due course have taken
place.   The act provides in a directory manner only so far as
the petitions are concerned for an orderly method in carrying out
the provisions of the Constitution.   The only subject with which
it deals is with special elections for the location of county seats,
and the clearly related and cognate matters of the appointment of
the necessary officials and procedure for holding it, accompanied
by the provisions for having the correct result declared by the
Governor, or, in event of controversy, the Supreme Court.

Counsel rely most strongly upon the case of *Lindsey v. United
States Savings & Loan Company,* 120 Ala. 156, 24 South. 171,
42 L. R. A. 783.   This was a case in which the United States
Savings & Loan Company, doing business in Alabama, had by
means of premiums, fines, or stock taken, sought to increase its
income on loans made, and the Supreme Court had held in a
previous case that this action on the part of the company was
a violation of the usury statute of that state.   The Legislature,
after the rendition of this first opinion, passed an act which pro-
vided "that any premiums, fines or stock heretofore taken and
hereafter taken to represent premiums for loans made by any
building and loan association doing business in this state, shall
not be treated as interest nor render such association amenable to
the laws relating thereto"; and the court held that, in so far as
the said act related to premiums heretofore taken, it was "ex-
pository and void," and that the title of the act, to "regulate the
business of building and loan associations in this state," would
not include such a retrospective provision.   In the discussion of
this act and of the constitutional provision here under considera-
tion, and taking a general view of the entire field, Chief Justice
Brickell of that court said:

"The Constitution is satisfied if the act has but one general

subject, and that is fairly indicated by the title. Cooley, Const. Lim. 172; *Ex parte Pollard,* 40 Ala. 98; *Ballentyne v. Wickersham,* 75 Ala. 533; *State v. Rogers,* 107 Ala. 444, 19 South. 909, 32 L. R. A. 520. * * * 'Each law shall contain but one subject.' The unity of subject is an indispensable element of legislative acts; but it is not the only element. The subject must be 'clearly expressed in its title.' The purpose of this requisition is, as expressed in the second proposition of the exposition of Judge Cooley, 'to prevent surprise or. fraud upon the Legislature by means of provisions in bill of which the title gives no intima-. tion, and which might, therefore, be overlooked, and carelessly and unintentionally adopted.' The third proposition must be deemed, and by all authority is deemed, of equal importance— 'to fairly apprise the people, through such publication of legislative proceedings as is usually made, of the subjects of legislation that are being considered, in order that they may have opportunity of being heard thereon, by petition or otherwise, if they so desire.' When there is fair expression of the subject in the title, all matters reasonably connected with it, and all proper agencies, or instrumentalities, or measures, which will or may facilitate its accomplishment, are proper to be incorporated in the act, and, as usually said, are cognate or germane to the title. But as was said in *Astor v. Railway Co.,* 113 N. Y. 110, 20 N. E. 598, 2 L. R. A. 789, 'the title must be such, at least, as fairly to support or give a clew to the subject dealt with in the act, and, unless it comes up to this standard, it falls below the constitutional requirement.' The future, and not the past, is the ordinary, usual field and scope of the legislation."

The Chief Justice then says:

"The intent that this section shall operate retrospectively is clearly expressed in the section itself, rendering it, as we have already said, an expository act, and a usurpation of judicial power. Is the intent expressed in the title? Does the title fairly indicate that such is the operation of the section? Does it fairly suggest or give a clew that such is the legislative intention?"

These questions are answered by the court in the negative.

Upon this authority counsel for petitioners predicate the argument that the provision contained in section 3 was also retroactive; and, not being provided for in the title to the act in ques-

tion, was void. But, as we have seen, the Constitution itself having provided for the very petition excepted from the operation of the act, and, as it is nether expository nor retroactive, in our judgment it is not subject to the objections which were successfully urged to the provision in the act held void by the Supreme Court of Alabama.

The Constitutions of most of the states have provisions similar to the one here in question. Section 16 of article 2 of the Constitution of Kansas reads: "No bill shall contain more than one provision which shall be clearly expressed in its title." The Legislature of that state passed an act, entitling it "An act to provide for the assessment and collection of taxes." This act embraced a section providing for a statute of limitations in reference to tax deeds, and it was urged that the title was not broad enough to include such provision. The Supreme Court of that state, speaking in reference thereto, through Mr. Justice Valentine, in the case of *Bowman et al. v. Cockrill*, 6 Kan. 311, said:

"The title of our tax law is as follows: 'An act to provide for the assessment and collection of taxes.' It is claimed that this title is not broad enough to include a statute of limitations, and what functions it is designed to perform. If it is a statute to aid in the collection of taxes, to enforce their prompt payment, it may undoubtedly be included in such a title; and that such is the design and object of all our statutes of limitations for tax deeds no one will controvert."

The syllabus of the case reads as follows:

"A statute of limitations, enatced for the purpose of aiding and assisting in the collection of taxes, and for the purpose of enforcing their payment, may be inserted in an act entitled 'An act to provide for the assessment and collection of taxes,' without contravening the provisions of section 16, art. 2, of the Constitution, which provides that 'no bill shall contain more that one subject, which shall be clearly expressed in its title.'"

In the investigation of this proposition we have examined a large number of authorities, in addition to those to which we have here called attention, and the principle and reason to be deduced

from all is, as is said by Mr. Justice Cooley in the case of *People v. Mahaney, supra,* that the purpose of the constitutional provision "is fully accomplished when the law has but one general object, which is fairly indicated by its title"; and in our judgment the body of the act and title in question meet this requirement. Yet, as we have seen, the section of the Constitution involved is self-executing, and a petition praying for the issuance of a proclamation thereunder calling a special election for the purpose of submitting to the qualified electors of a county the question of removing or relocating the county seat, filed with the Governor prior to April 17, 1908, depends in no particular for its force and validity on the bill here in question, but upon the self-executing provisions of the Constitution.

This brings us to the third subdivision of the second paragraph embodying plaintiffs' contention, to wit: "That the election held in Grant county, Okla., was held under an act re-enacted and not published at length." The particular section of the Constitution with which it is urged it is in conflict is section 57 of article 5, which provides: "No law shall be revived, amended, or the provisions thereof extended or conferred, by reference to its title only; but so much thereof as is revived, amended, extended, or conferred shall be re-enacted and published at length." The contention of counsel representing the petitioners on this proposition is best elucidated by quoting his statement thereof from his brief:

"The constitutional provision applies only to amendments, which, without the presence of the original act, are unintelligible. * * * That act would be wholly inadequate to hold a county seat election without reference to the Oklahoma statute. The two combined are required in order to hold an election. It is the amendment of the old statute, without re-enacting it and publishing it at length, which is the vice in the county seat election law."

The act under question is made up of 24 sections; the provisions thereof being substantially as follows: Section 1. Any county in the state desiring to hold a special election for the pur-

pose of selecting a permanent location for a county seat shall be governed by the general election laws, when not in conflict herewith. Section 2 is a substantial copy of paragraph "a" of section 6 of article 17 of the Constitution, and provides for the filing with the Governor of the state all petitions upon which the proclamation of election is issued. Section 3 provides for the form of the petitions, and further provides that this section shall not apply to petitions on file with the Governor at the date of the approval of this act. Section 4 provides for the holding of such election upon such public notice as the Governor, in his proclamation, may direct, and sets out the method whereby cities, towns, or places competing for the county seat may have their names placed upon the official ballot. Section 5 provides for the form of the petition in such case, and again exempts from its operation petitions on file with the Governor at the date of its approval. Section 6 provides for the creation of an election board and fixes its duties, "as prescribed by law for county election boards, when not in conflict herewith." Section 7 provides that such special election board shall furnish each voting precinct with two ballot boxes, and further provides that such board shall attend to the printing and furnishing of ballots. Section 8 provides that the Governor shall select and commission a special election commissioner for each voting precinct or place in the county, and sets out the oath of such commissioner. Section 9 provides for the qualifications of such special election commissioner. Section 10 provides for the assignment of each commissioner to a particular voting precinct, and provides that he "shall perform the duties of an inspector of election in such precinct or voting place so assigned, as provided by the general election laws when not in conflict with the provisions of this act," and sets out his duties further, in requiring his attendance at the county seat prior to the election, and making it his duty to receive from the special election board, before provided for, the ballots, ballot boxes, and other election paraphernalia, and to have them at the precinct on election day, and further providing for the procedure in the event of his failure. Sec-

tion 11 provides for the duties of the special election board in
seeing that each precinct or voting place is supplied with books,
etc., and placing upon it the duty of selecting the judges and
clerks, which judges and clerks, it is provided, are to receive the
fees received for like services in any general election.  Section 12
provides the procedure of voting.  Section 13 provides that "the
precinct board of canvassers shall canvass the vote, make and cer-
tify said returns to the Governor, who shall canvass all such elec-
tions held as provided herein," which with that which follows in
the section is virtually a copy of paragraph "b" of section 6 of
article 17 of the Constitution, and relates generally to the law
prevailing in reference to elections for the locating of county seats
named in the Constitution. Section 14 provides that "if a majority
of all the votes cast in the county at such special election shall be
in favor of any city, town or place, then such city, town or place
shall thereafter be the county seat." This, together with the bal-
ance of the section, is a literal copy of the balance of paragraph
"b" of section 6 of article 17 of the Constitution. ﹒ Section 15
provides for the conveyance, by the special election commissioner,
cf the ballot boxes, returns, and other election paraphernalia to
the county clerk, where they select one of their number to convey
to the office of the Governor of the state all of the boxes, cer-
tificates, and returns, and providing for proper receipts therefor.
Sections 16 and 17 provide for the jurisdiction of the Supreme
Court over all controversies which may arise under the provi-
sions of the act.  Section 18 provides for the payment, by the
county, of the special election commissioners.  Section 19 pro-
vides that any city, town, or place, being the candidate for the
permanent location of any county seat at any such election, may
appoint and designate one qualified elector or voter of such place
to act as challenger, and provides for the appointment of poll
books holders and watchers to attend upon the election, and also
provides for the punishment for a denial to these parties of the
rights granted thereunder.  Sections 20, 21, and 22 provide for
punishment of parties violating the law in reference to the hold-

ing of said election. Section 23 provides for the repeal of all acts in conflict, and section 24 declares an emergency.

From the abstract of the different sections which we have made of the act in question it will be readily seen that the same nowhere appears to be an amendment of any previous law. Of course, the provision of the Constitution under consideration does not abolish nor in any way affect the rule under which former statutes are repealed by implication, and the act in question nowhere attempts to repeal any of the Oklahoma laws, except conflicting provisions of the county seat election statute, and this was accomplished before it by the Constitution. It is neither an amendatory nor a repealing act, as it relates to any of the general election laws invoked to carry it out. It leaves every election law of Oklahoma the same as it would have been, had this act not been passed, except those relating to the holding of elections for the location of a county seat. The original provisions of the act bearing in any particular upon the existing election laws of the state relate solely, and become effectual only, when the terms of the act are called into use to hold such special elections; but the laws invoked remain the same as they were. The Constitution itself provided that "such election shall be held under the provisions of the election laws of the state"; and this act, having by its terms created certain boards, and having fixed and prescribed by original provisions certain of their duties, then, in keeping with the terms of the constitutional provision, placed upon them the duty of filling their respective offices and holding the election provided for, in accordance with the election laws of the state. This fixing of their duties and establishing the procedure under which they were to act is argued to be conferring upon them, by reference to the title of the laws only, the provisions of previous acts or laws, without re-enacting and publishing them at length; and hence the act it is urged rendered invalid, owing to the limitation mentioned in the Constitution.

Our attention is called to a number of authorities wherein statutes extended herd law and other similar provisions over other

sections of the territory than that to which the original act applied; this extension being attemped by a mere reference to the previous act, or to the title of it. These cases, in our judgment, will not aid us to any extent in coming to a correct solution of the question here, for the reason that no such proposition is before us. A brief review of the leading authorities of that kind cited by counsel will, however, perhaps best elucidate our view.

The case of *Sewart v. Court of County Commissioners,* 82 Ala. 209, 2 South. 270, was one wherein an act passed by the Legislature of Alabama February 23, 1883 (Acts 1882-83, pp. 616-618), was before the court for consideration, the title to which read as follows:

"An act to empower the court of county commissioners of Hale county to extend the limits of the Canebrake agricultural district in said county, or to establish new and separate agricultural districts in said county, upon petition of a majority of the landowners in any beat or district to be affected thereby."

The fourth section of the act provided:

"That the act entitled 'An act to establish the Canebrake agricultural district,' approved February 20, 1866, as amended January 2, 1874, and all laws in reference thereto, shall be in full force over and upon all districts established under this act, or that may be by said court included in said Canebrake agricultural district, as though incorporated in this act."

Mr. Justice Somerville, who wrote the opinion of the court, after reciting the section of the Constitution of that state which provided, as does ours, "that no law shall be revived, amended, or the provisions thereof extended or conferred by reference to its title only, but so much thereof as is revived, amended, extended, or conferred, shall be re-enacted and published at length," said:

"That the act of February 23, 1883, under consideration, is violative of this provision of the Constitution, is almost too plain for argument. It very clearly attempts to extend an existing law by reference to its title only. We leave out of view any question as to delegating the power to establish new districts, or to extend

the limits of existing ones, upon the court of county commissioners. Our proposition is that section 4 of the act now under discussion seeks to extend the provisions of 'the act entitled an act to establish the Canebrake agricultural district, approved February 20, 1866,' and other laws amendatory thereof, over the territory of all new districts which may be designated by the court of county commissioners under the authority given them by this law, by reference only to the title of the acts sought to be extended. These acts are not 're-enacted and published at length,' nor any part or section of them. They are yet declared to be as operative 'as though incorporated in this act'—meaning the act of February 23, 1883 (Acts 1882-83, pp. 616-618). The attempt is plainly to extend the provisions of the act over additional territory at the option of the court of county commissioners, and, we repeat, there is no reference to the contents of the act, otherwise than to its title only. This, under the clause of the Constitution above quoted, was insufficient."

To the same effect, in a later case, is the holding of the same court in the case of *Bay Shell Road Company v. O'Donnell*, 87 Ala. 376, 6 South. 119, wherein there was under consideration an act of the Legislature the material provisions of which will be observed in the following portion of the opinion, written by Justice McClellan, in which he said:

"By section 2 of an act 'for the protection of life and property upon the Bay shell road,' approved February 17, 1885, it is provded, 'that it shall be unlawful for any person to allow any loose animal belonging to them to run at large upon said Bay shell road, and any animal found running at large on said road may be, by any officer or employe of said Bay Shell Road Company, taken up and estrayed in the manner as is provided by article 1, chapter 6, title 13, part 1, of the Code of Alabama.' Acts 1884-85, pp. 392, 393."

After reciting the section of the Constitution referred to, the learned justice says:

"By the act we are considering the estray law of this state is amended so as to embrace the Bay shell road, in addition to residences and plantations; its provisions are extended to said road, and the rights and powers which it gives to owners of residences and plantations are conferred upon the Bay Shell Road

Company; and all this is attempted to be done by even less than a reference to its title, and without any pretense of re-enacting the law, all of the provisions of which are thus amended, extended, and conferred, or of publishing at length. The purpose of this constitutional requirement was to have each bill considered by the General Assembly in and of itself present the full scope, operation, and effect of the proposed law, so that members might know and intelligently consider the details of every measure, and vote neither aye nor nay 'in blind ignorance of its provisions or even in trusting confidence to the representations of others.' "

A number of other cases of similar import are presented to us; but to our minds those cited, and from which we have quoted, show their lack of applicability to determine the proposition involved in this case. This distinction we will endeavor to draw more clearly as we proceed.

A number of states have provisions in their Constitutions similar to the one in question, and the direct proposition here involved has been decided many times; but, before entering into an investigation of the cases presenting concrete instances wherein this rule has been invoked and applied, we invite attention to the declaration of the Supreme Court of Michigan, speaking through Mr. Justice Cooley, in the case of *People v. Mahaney, supra,* wherein it declares the purposes, scope, and limitations sought to be established by this provision to be as follows:

"It is next objected that the law is invalid because in conflict with section 25 of article 4 of the Constitution, which provides that 'no law shall be revised, altered, or amended by reference to its title only; but the act revised, and the section or sections of the act altered or amended, shall be re-enacted and published at length.' The act before us does not assume in terms to revise, alter, or amend any prior act, or section of an act; but by various transfers of duties it has an amendatory effect by implication, and by its last section it repeals all inconsistent acts. We are unable to see how this conflicts with the provision referred to. If, whenever a new statute is passed, it is necessary that all prior statutes, modified by it by implication, should be re-enacted and published at length as modified, then a large portion of the whole code of laws of the state would require to be

republished at every session, and parts of it several times over, until, from mere immensity of material, it would be impossible to tell what the law was. If, because an act establishing a police government modifies the powers and duties of sheriffs, constables, water and sewer commissioners, marshals, mayors, and justices, and imposes new duties upon the executive and the citizen, it has thereby become necessary to re-enact and republish the various laws relating to them all as now modified, we shall find, before the act is completed, that it not only embraces a large portion of the general laws of the state, but also that it has become obnoxious to the other provisions referred to, because embracing a large number of objects, only one of which can be covered by its title. This constitutional provision must receive a reasonable construction, with a view to give it effect. The mischief designed to be remedied was the enactment of amendatory statutes in terms so blind that legislators themselves were sometimes deceived in regard to their effect, and the public, from the difficulty in making the necessary examination and comparison, failed to become apprised of the changes made in the laws. An amendatory act which purported only to insert certain words, or to substitute one phrase for another in an act or section which was only referred to, but not republished, was well calculated to mislead the careless as to its effect, and was, perhaps, sometimes drawn in that form for that express purpose. Endless confusion was thus introduced into the law, and the Constitution wisely prohibited such legislation. But an act complete in itself is not within the mischief designed to be remedied by this provision, and cannot be held to be prohibited by it without violating its plain intent."

The syllabus to this case reads as follows:

"A law which does not assume, in terms, to revise, alter, or amend any prior act, or section of an act, but by various transfers of duties has an amendatory effect by implication, although it expressly repeals all inconsistent acts, does not conflict with section 25 of article 4 of the Constitution."

Chief Justice Brickell of the Supreme Court of Alabama, having under consideration this identical section of the Constitution of that state in the case of *State ex rel. etc., v. Rogers et al.,* 107 Ala. 444, 19 South. 909, 32 L. R. A. 520, and speaking further to the same point after quoting from *People v. Mahaney,*

*supra*, to a portion of which we have called attention, quoted from the case of *Ex parte Pollard,* 40 Ala. 98, wherein the Supreme Court of that state, dealing with this same question, said:

" 'It was never intended by the Constitution that every law which would affect some previous statute of variant provisions on the same subject would set out the statute or statutes so affected at full length. If this were so, it would be impossible to legislate. The constitutional provision reaches those cases where the act is strictly amendatory or revisory in its character. Its prohibition is directed against the practice of amending or revising laws by additions, or other alterations, which without the presence of the original act are usually unintelligible. If a law is in itself complete and intelligible, and original in form, it does not fall within the meaning and spirit of the Constitution.' All the purposes of the present act could doubtless have been accomplished by an act strictly and in form amendatory—by setting out the existing statutes, amending and re-enacting them; but it is obvious the amendatory act would have been cumbersome, and not more intelligible than is the present act. Whether an amendatory act or an original act should be employed was matter of legislative judgment and discretion, which the courts cannot control. In *People v. Banks,* 67 N. Y. 575, it is said: 'It is not necessary, in order to avoid a conflict with this article of the Constitution, to re-enact general laws whenever it is necessary to resort to them to carry into effect a special statute. Such cases are not within the letter or spirit of the Constitution, or the mischief intended to be remedied. By such a reference the general statute is not incorporated into or made a part of the special statute. The right is given, the duty declared, or burden imposed by the special statute; but the enforcement of the right or duty and the final imposition of the burden are directed to be in the form and by the procedure given by the other and general laws of the state. Reference is made to such laws, not to affect or qualify the substance of the legislation, or vary the terms of the act, but merely for the formal execution of the law. The evil in view in adopting this provision of the Constitution was the incorporating into the acts of the Legislature, by reference to other statutes, of clauses and provisions of which the legislators might be ignorant, and which affecting public or private interests in a manner and to an extent not disclosed upon the face of the act, a bill might be-

come a law, which would not receive the sanction of the Legislature if fully understood.' "

The syllabus of the case elucidates the point involved and shows the relation of the decision to the case at bar, and is as follows:

"Act Dec. 17, 1894 (Acts 1894-95, p. 186), relieving the judge of probate from official connection with the board of revenue of a certain county, and devolving on a chairman, selected by the board, and the clerk of the circuit court, the duties performed by such judge, is not invalid for the reason that it does not set out the original act creating boards of revenue so amended, as directed in Const. 1875, art. 4, § 2, providing that no law shall be amended by reference to its title only, but so much thereof as amended shall be enacted and published at length; the constitutional provision applying only to amendments which, without the presence of the original act, are unintelligible."

Other authorities to the same end, with substantially the same conclusion, are as follows: *Ex parte Thomas,* 113 Ala. 1, 21 South. 369; *Birmingham Union Railway Company v. Elyton Land Company,* 114 Ala. 70, 21 South. 314; *Watkins v. Eureka Springs,* 49 Ark. 131, 4 S. W. 384; *Cobb et al. v. Vary,* 120 Ala. 263, 24 South. 442; *Phoenix Assurance Company v. Fire Department,* 117 Ala. 631, 23 South. 843, 42 L. R. A. 468; *St. Louis & San Francisco Railroad Company v. Southwestern Telephone & Telegraph Company,* 121 Fed. 276, 58 C. C. A. 198; *City Council of Montgomery v. Birdsong,* 126 Ala. 632, 28 South. 522; *Beason et al. v. Shaw,* 148 Ala. 544, 42 South. 611. Brief excerpts, which are self-explanatory, taken from these different cases, will elucidate the force given by the courts to this section of the Constitution, and in our judgment best make manifest that the act in question is not violative of its terms or spirit.

In the case of *Ex parte Thomas, supra,* the court says:

"This clause of the Constitution has been the matter of frequent interpretation and construction. The exposition of the evil in legislation it was intended to prevent, made by Judge Cooley, has been generally, if not universally, accepted: 'The

Vol. 21—48

mischief designed to be remedied was the enactment of amendatory statutes in terms so blind that legislators themselves were sometimes deceived in regard to their effects, and the public, from the difficulty of making the necessary examination and comparison, failed to become apprised of the changes made in the laws. An amendatory act which purported only to insert certain words, or to substitute one phrase for another, in an act or section which was only referred to, but not published, was well calculated to mislead the careless as to its effect, and was, perhaps, sometimes drawn in that form for the express purpose. Endless confusion was thus introduced into the law, and the Constitution wisely prohibited such legislation.' Cooley, Const. Lim. 181; *People v. Mahaney*, 13 Mich. 497."

In the case of *Birmingham Union Railway Company v. Elyton Land Company, supra,* the court says:

"Street railroad companies, organized and incorporated under the laws of Alabama, may acquire by gift, purchase, or condemnation real estate in this state, for the right of way of street railroads, a strip, tract, or parcel of land, not exceeding 30 feet in width, for the right of way for said street railroads, and said street railroad companies shall have the right to condemn and take possession of said land, on payment to the owner thereof of a just compensation, in the same manner as now provided by law for taking private property for railroads and other public uses, in article 2, c. 17, tit. 2, p. 3, of the Code of 1886, Acts 1886-87, p. 122."

The syllabus of the case is as follows:

"The act approved December 10, 1886 (Acts 1886-87, p. 122), providing that street railroad companies may condemn rights of way and take possession thereof on paying a just compensation, 'in the same manner as now provided by law for taking private property for railroad and other public uses in article 2, chapter 17, title 2, part 3, of the Code,' does not violate article 4, § 2, of the Constitution of 1875 which ordains that 'no law shall be revived, amended, or the provisions thereof extended or conferred by reference to its title only; but so much thereof as is revived, amended, extended or conferred shall be reenacted and published at length'; the extension or conferring of said code provisions by the statute not coming within the mean-

ing of the constitutional provision, which applies only to amendments which, without the presence of the original act, are unintelligible."

In the case of *Watkins v. Eureka Springs, supra,* the Supreme Court of Arkansas says:

"Section 2 of the act of February 27, 1875 (Laws 1874-75, p. 189), for calling in the outstanding warrants of counties, cities, and towns (Mansf. Dig. §§ 1150-1153), merely adopts for cities and towns the method of procedure provided for counties in like cases, and does not thereby violate section 23, art. 5, of the Constitution, which declares that 'no law shall be revived, amended, or the provisions thereof extended or conferred, by reference to its title only; but so much thereof as is revived, amended, extended or conferred, shall be re-enacted and published at length.' But this provision of the Constitution is violated by section 4 of the act referred to, which undertakes by a general reference to extend the positive provisions of law applicable to calling in the warrants of counties to a like proceeding by cities and towns."

In the case of *Cobb et al. v. Vary, supra,* the court in the syllabus holds:

"An act of the Legislature, which is in form original, and is in itself intelligible and complete, and does not, either in its title or in its body, appear to be revisory or amendatory of any existing law, is not within the inhibition of the Constitution that 'no law shall be revived, amended, or the provisions thereof extended or conferred by reference to the title only,' etc. (Const. 1875, art. 4, § 2); and this is true where such act seeks to effectuate the rights conferred, by referring to certain sections of the Code as furnishing means necessary for their enforcement."

In the discussion of the case, Mr. Justice Haralson, speaking for the court, says:

"The purchasers under this act are authorized to take possession of lands described in their respective deeds, when the same are not held adversely, and are authorized to bring suits to recover such lands when held adversely. In cases of litigation to recover or defend possession acquired under such deeds, the parties to such suits shall have all the rights and rest under all the disabilities given and imposed by sections 597, 600, 601, 602, 603 of the Code of Alabama of 1886."

This act was held not to be repugnant to the provisions of the Constitution under discussion.

In the case of *Phoenix Assurance Company v. Fire Department, supra,* the court in the syllabus holds:

"The statute approved February 26, 1872, entitled 'An act to extend to the fire companies in the city of Montgomery the benefit of an act to raise a fund for the benefit of the fire companies in the city of Mobile, approved March 1, 1870' (Acts 1871-72, p. 390), by the provisions of which there was an extension to the fire companies or fire department of the city of Montgomery all the rights and privileges, of all the duties, and of all the remedies, which by the act referred to were conferred upon or enjoyed by the fire companies of the city of Mobile, is not violative of section 2 of article 4 of the Constitution of 1868, then in force, which provided that 'no law shall be revised or amended, unless the act contain the entire act revised, or the section or sections so amended'; said statute not being an amendment or revision of the former statute, but belonging to the class of statutes known as 'reference statutes,' which refer to, and by the reference adopt wholly or partially, pre-existing statutes, and which, under the Constitution of 1868, were valid."

In the discussion Brickell, Chief Justice, makes clear the distinction we draw in holding this act not repugnant to our Constitution:

"It may be that the legislative intent could have been effected by an amendment of the act pertaining to Mobile. Conceding that to be true, there was no compulsion upon the Legislature to prefer that mode of expressing its will, rather than an act original in form, complete, and intelligible. A limitation similar to that found in the Constitution of 1868 was contained in the Constitution of 1865, and the unbroken construction of the limitation was that it was without application to a legislative act not purporting to be revisory or amendatory, original in form, complete, and intelligible. *Ex parte Pollard,* 40 Ala. 100; *Tuscaloosa Bridge Company v. Olmstead,* 41 Ala. 9; *Falconer v. Robinson,* 46 Ala. 340-348. * * * The argument misapprehends the real character of the statute. It belongs to a distinctive class of statutes, known or termed as 'reference statutes,' not of infrequent enactment; constitutional limitation not forbidding. Statutes which refer to,

and by reference adopt wholly or partially, pre-existing statutes. In the construction of such statutes, the statute referred to is treated and considered as if it were incorporated into and formed part of that which makes the reference. *Turney v. Wilton*, 36 Ill. 385; Sedgwick, Stat. & Con. Law, 229, note; Sutherland, Stat. Con. §§ 147, 257; *Knapp v. Brooklyn*, 97 N. Y. 520. The two statutes co-exist as separate and distinct legislative enactments, each having its appointed sphere of action; and the alteration, change, or repeal of the one does not operate upon or affect the other. *Sika v. Railway Company*, 21 Wis. 370; Sutherland, Stat. Con. §§ 147, 257."

The Supreme Court of Alabama, in the case of *City Council of Montgomery v. Birdsong, supra,* having under consideration this provision of the Constitution, said:

"That provision has been repeatedly held to apply to statutes strictly amendatory, and not to such as are independent and complete within themselves, although they adopt by reference merely the provisions of the other statutes on the same subject, there appearing in more enlarged and extended form. Such independent legislation does not fall within the mischief designed to be remedied or prohibited by this provision of the Constitution. We have considered this subject heretofore, and so recently, there remains no good reason for enlarging further on it. *State v. Rogers*, 107 Ala. 444, 19 South. 909, 32 L. R. A. 520; *Cobb v. Vary*, 120 Ala. 263, 24 South. 442. See, also, *People v. Mahaney,* 13 Mich. 481."

In the syllabus thereof it is held:

"An act of the Legislature, which is in form original and is in itself intelligible and complete, and does not either in its title or in its body appear to be revisory or amendatory of any existing law, is not within the inhibition of the Constitution that 'no law shall be revised, amended, or the provisions thereof extended or conferred by reference to title only' (Const. 1875, art. 4, § 2); and this is true where such act seeks to effectuate the rights conferred by referring to other existing statutes, as furnishing a remedy necessary for their enforcement."

In a still later decision (November, 1906, *Beason v. Shaw, supra*) the same court having occasion to pass upon a statute which provided for contests of election contained the provisions

that "such election may be contested on the same ground and in
the same manner before the probate judge as contests of election
of constable are held before said probate court," it was contended
that this provision was violative of the section of the Constitution
which we have here under consideration, and the court, speaking
through Mr. Justice Denson, said:

"The question presented for determination is, does the act
under which the election was held effectually provide for a con-
test of the election? Section 7 (page 434, Gen. Laws 1903) of
the act is in this language: 'Such election may be contested on
the same ground and in the same manner before the probate
judge as contests of election of constable are held before said
probate court.' According to our decisions there is no merit in
the point that this seventh section of the act is obnoxious to that
clause of section 45, art. 4, of the Constitution, which provides
that no law shall be revived, amended, or the provisions thereof
extended or conferred, by reference to its title only; but so much
thereof as is revived, amended, extended, or conferred shall be
re-enacted and published at length. *State v. Rogers* 107, Ala. 444,
19 South. 909, 32 L. R. A. 520; *Birmingham Union Ry. Co. v.
Elyton Land Co.,* 114 Ala. 70, 21 South. 314; *Phoenix Assurance
Co. v. Fire Department,* 117 Ala. 631, 23 South. 843, 42 L. R.
A. 468; *Cobb v. Vary,* 120 Ala. 263, 24 South. 442; *City Council
of Montgomery v. Birdsong,* 126 Ala. 632, 28, South. 522; *State
ex rel Porter v. Crook,* 126 Ala. 600, 28 South. 745."

The syllabus of the case reads as follows:

" Gen. Laws 1903, p. 434, § 7, providing that an election to
determine whether stock shall be prohibited from running at large
may be contested on the same grounds and in the same manner as
contests of election of constable are held, is not obnoxious to
Const. 1875, art. 4, § 45, providing that no law shall be revived,
amended, or extended by reference to its title only, and the sec-
tion adopts the law relating to contests of election of constable."

The state of Arkansas has a constitutional provision similar
to the one from our own here under discussion. Its Legislature
passed an act providing that any corporation organized for the
purpose of transmitting intelligence by telegraph or telephone
might construct and operate its line within the state. Section 2

provided "that, in the event that such telegraph or telephone companies fail to secure the right of way by consent or agreement, then they shall have the right to condemn the easements they require 'in the manner prescribed by law for taking private property for right of way for railroads as provided by sections 5458 to 5467, both inclusive, of the Revised Statutes of Arkansas, 1884.'" Laws 1885, p. 177, No. 107. On a contest arising over the construction by a telephone company of its line of wire along the right of way of a railroad company, the construction of this constitutional provision was called into question. On consideration of the same by the Circuit Court of Appeals of the Eighth Circuit, Judge Sanborn, speaking for the court in the case of *St. Louis & San Francisco Railroad Company v. Southwestern Telephone & Telegraph Company, supra,* in the consideration of the case reviews the facts as follows:

"The argument is that the act under which these condemnation proceedings are conducted is void because sections 2770 to 2781, inclusive, Sand. & H. Dig., were extended to telephone companies by reference to their numbers, without re-enacting and publishing them at length. The answer to this argument is twofold: In the first place, the right to condemn was conferred, and the power of eminent domain was granted to the telephone and telegraph companies, not by reference, but by enactment, by sections 1, 2, and 13 of the act of March 31, 1885 (sections 2757, 2758, 2770, Sand. & H. Dig.); and even if that portion of the act which took effect by reference, and which simply prescribed the method of procedure for the condemnation proceedings, had been unconstitutional, there was ample power in the court, under the common law, to proceed to effect the condemnation after the right and power had been given. The second answer to this contention is that, while section 22, art. 5, of the Constitution of Arkansas, limits legislation which grants, modifies, or destroys the rights of parties, it has no application to legislation which simply affects remedies and methods of procedure. *Watkins v. Eureka Springs,* 49 Ark. 131, 134, 4 S. W. 384; *Geer v. Board of Com'rs of Ouray Co.,* 97 Fed. 435, 439, 38 C. C. A. 250, 254. As all that portion of the act of 1885 which conferred any rights upon the telephone and telegraph companies was enacted and published

at length, and the only portion which extended any provisions of the law by reference to sections related to the method of procedure alone, the act was neither unconstitutional nor void, and it conferred plenary power upon the telephone company to condemn the easement it seeks."

The syllabus states accurately and concisely the rule, and is as follows:

"Section 22, art. 5, of the Constitution of Arkansas, which reads, 'No law shall be revived, amended, or the provisions thereof extended or conferred by reference to its title only, but so much thereof as is revived, amended, or extended or conferred shall be re-enacted and published at length,' limits legislation which grants, modifies, or destroys rights, but it has no application to legislation which affects remedies and methods of procedure alone."

We have carried comment and citations further than we otherwise should because of the vigorous insistence by counsel that the act in question was vulnerable to their attack on the constitutional ground above discussed. We are not able to agree with them, and are satisfied of the correctness of the conclusion to which we have come, both from principle and authority derived from the construction placed upon like constitutional provisions by scholarly and learned courts of other states.

It is next insisted by counsel that the election held in Grant county was without authority of law, because it was held under an act violating the constitutional restriction in reference to special legislation. Section 46 of article 5 of the Constitution provides "that the Legislature shall not, except as otherwise provided in this Constitution, pass any local or special law  *  *  *  regulating the affairs of counties  *  *  *  for the opening and conducting of elections." In conjunction with this objection urged by counsel, it is contended that the act in question was a special or local law, and that it was not published as required by section 32 of article 5 of the Constitution, which reads as follows:

"No special or local law shall be considered by the Legislature until notice of the intended introduction of such bill or bills shall first have been published for four consecutive weeks in some weekly

newspaper published or of general circulation in the city or county affected by such law, stating in substance the contents thereof, and verified proof of such publication filed with the Secretary of State."

We believe that there is no merit in either of these points. In the first place, the act is not a special act, although it provides for a special election. It is a general act, applicable to every county in the state alike, and to every county seat in the state alike. It is no more a special act than would be a law providing for special deputy sheriffs, special policemen, or for a special jury venire, applicable generally throughout the state. Neither is it a local law requiring publication, but equally general with all other laws. In addition to this, section 6 of article 17 of the Constitution is a complete answer to both propositions, for therein is contained the foundation upon which the passage of this act is constitutionally predicated.

The fifth objection goes to the point that the election "was not held in conformity with the purposes expressed in the executive proclamation." The proclamation of the Governor, issued hereunder called an election "for the purpose of submitting to the qualified electors of said county the question of changing, removing, or relocating the county seat of said county." This proclamation was issued on the 19th day of March, 1908, nearly 30 days before the passage and approval of the act here under consideration, and hence was issued by authority of and under the provisions of section 6 of article 17 of the Constitution. The Constitution fixed the counties of the state, and named the place or town in each county for the county seat thereof, and provided that "the towns herein named as county seats shall be and remain the county seats of their respective counties until changed by vote of the qualified electors of such county, in the following manner." Then follows the proviso in reference to special elections, and it was under this portion of the Constitution that the Governor acted in issuing his proclamation.

Now, taking the terms of the constitutional provision men-

tioned into consideration, and considering, further, that the petitioners herein acted under this proclamation, and that there was, in fact, submitted to the voters of Grant county the real question well known to have been in the minds of all the people of that county, and taking into consideration the further fact that it is not pleaded that any one was misled, or that a fair election failed in any particular by virtue of the terms of the election proclamation, we are unable to agree with counsel that the election was void on account thereof. The Constitution provided that the county seats named therein shall be and remain the county seats of their respective counties until changed by a vote of the qualified electors of the county. Except where there is an election and a vote, each county seat in the state is a permanent county seat, and any election called in reference to such county seat could be called for no other purpose than that set forth in the proclamation of the Governor, which was "to change, remove, or relocate." Under its terms the question was squarely submitted to the people of Grant county as to whether or not the seat of government should be changed or removed from the place where it then was, or should be relocated where the constitutional convention and the people of the state had previously located it.

After such election and expression of the people is had upon the matter, and a deliberate declaration made by them as to the place where the county seat is to be located, such place in its turn becomes the permanent county seat of the county, and would remain so until an election was again held to call it into question. A place is permanent, as a county seat, only so long as the people suffer it to remain so. In this sense, and in this only, under the terms of our Constitution, can any place in a county be held to be a permanent location of a county seat. Elections will be held, but each will be with the purpose of the people to establish, as is said in the caption of the act in question, a permanent location of a county seat. *State ex rel. Bradford v. Board of Commissionersrs of Harper County*, 34 Kan. 302, 8 Pac. 417.

The last objection urged by counsel is that "the method, mode,

and manner of conducting the county seat election, held in Grant county, Okla., on the 27th day of May, 1908, was illegal and void, being in conflict with the laws of the state of Oklahoma and the fourteenth amendment of the Constitution of the United States." Under this head attention is called to that portion of the petition which sets out the requirement of article 2, c. 13, p. 157, of the session Laws of Oklahoma of 1903, wherein residents of all cities of the first class are required to register prior to being permitted to vote, this provision being carried into the laws of the state under section 2 of the schedule, quoted *supra*; and it is argued that this requirement of the voters of Pond Creek imposed an additional qualification upon them, in order that they might be permitted to vote, than was imposed upon other citizens of the county, and particularly of the citizens of Medford, the successful competitor in this contest, and hence was violative of section 7 of article 3 of the Constitution of the state, which provides that "the election shall be free and equal." It is also contended that the law requiring registration in cities of the first class operated unequally and to the detriment of the citizens of Pond Creek, in that it violated the fourteenth amendment of the Constitution of the United States and denied to them the equal protection of the law.

Section 6 of article 3 of the Constitution of Oklahoma is as follows:

"In all elections by the people the vote shall be by ballot and the Legislature shall provide the kind of ticket or ballot and make all such other regulations as may be necessary to detect and punish fraud, and preserve the purity of the ballot, and may when necessary, provide by law for the registration of electors throughout the state or in any incorporated city or town thereof, and, when it is so provided, no person shall vote at any election unless he shall have registered according to law."

By the foregoing provision of the Constitution it will be noted that the Legislature is required to make such regulations as may be necessary to detect and punish fraud, etc., and may,

"when necessary, provide by law for the registration of electors throughout the state or in any incorporated city or town thereof." Under this there can be no question but that the Legislature was the proper body to. determine the question of necessity—to come to the conclusion of when it was necessary and to act on it. This act requiring registration was in force and effect under the territorial regime, and it was continued in force and effect in the state by virtue of section 2 of the schedule. The Legislature of the territory having passed it, the people of the state having adopted it, and the Legislature of the state not repealing it, it results in a legislative finding of the existence of the necessity for such registration.

Section 4 of article 5 of the Kansas Constitution, under the title of "Suffrage," reads as follows: "The Legislature shall pass such laws as may be necessary for ascertaining, by proper proofs, the citizens who shall be entitled to the right of suffrage hereby established." When the law requiring registration, passed by the Legislature of that state in 1879, was called into question, Mr. Justice Brewer, speaking for the court in the case of *State v. Butts*, 31 Kan. 537 2, Pac. 618, said:

" 'Such laws as may be necessary' is the language. Who besides the Legislature, the lawmaking body, can decide this question of necessity? It may deem one provision adequate for country precincts, while the conditions of city life require other and more stringent rules. Obviously the conditions and dangers are different; and, if it may prescribe one rule for cities and one rule for rural districts, then a separate law for either is good, and the validity of neither will depend on the terms ·or even the existence of the other. There is no difference between this and other subjects of legislation; and, if the law applies to all matters and things of the same nature and in the same condition, the courts may not interfere because it does not reach to matters of a different nature or in a different condition. Such is the general ' import of our decisions, as well as those of other states."

The Constitution of the state of Kentucky declared the qualifications of voters, followed by a provision granting to the Gen-

eral Assembly the right to provide by law rules and regulations upon the observance of which the right to exercise the privilege by those possessing the constitutional qualifications was made to depend. Section 4 of article 8 provides:

"Laws may be made to exclude from office and from suffrage those who shall thereafter be convicted of bribery, perjury, or other crimes of high misdemeanors. The privilege of free suffrage shall be supported by laws regulating elections, and prohibiting, under adequate penalties, all undue influence thereon from power, bribery, tumult, or other improper practices."

Under this provision an act was passed which provided for the registeration of voters in the city of Louisville, and, on its being assailed for the reason that it was unconstitutional, Judge Lewis, of the Court of Appeals, the highest court of that state, in the case of *Commonwealth v. McClelland,* 83 Ky. 686, said:

"In the country and small towns, where comparatively few persons offer to vote who are strangers to officers of election, or who cannot be readily identified, the necessary examination and test of qualifications may be made on the date of election at the voting places without much hindrance or risk of imposition. But in large cities, where there are greater temptations and facilities for illegal voting, always producing confusion and disorder, it is often impossible for officers of elections, without previous registration of qualified voters, to either prevent fraud or afford to those entitled the opportunity to safely, quietly, and more promptly cast their votes; and from necessity other and more effectual regulations than are provided by the general law, or than are required elsewhere, or a majority of the people of the state would probably be willing to adopt, must be provided for such places in order to secure therein free and equal elections in the meaning of the Constitution as we understand it. Such regulations would not, as erroneously argued by counsel, be in any sense qualifications additional to those prescribed by the Constitution, or different from those required of voters elsewhere in the state, but simply the means by which more certainly and effectually to support free suffrage; and as such they are authorized, and, wherever necessary, required, by the Constitution."

In the course of his opinion he quotes approvingly from Cooley's Constitutional Limitations, § 602, as follows:

"The provision for a registry deprives no one of his right, but is only a reasonable regulation under which the right may be exercised. Such regulations must always have been within the power of the Legislature unless forbidden."

The law was epitomized by the court in the following syllabus:

"The Legislature has the power to enact a law requiring qualified voters to be registered before the day of election as a condition of the exercise of their right of suffrage, and such a law may be local in its application."

Nor is the law relating to registration of voters in cities of the first class open to the charge of being either local or special legislation, in view of the fact that it applies equally and alike to all cities of a general class and operates equally upon all voters residing in any of these cities. Nor, in our judgment does the fact that the voters residing in the city of Pond Creek were required to register prior to being permitted to vote violate plaintiffs' rights under the fourteenth amendment to the Constitution of the United States. *Mason v. Missouri*, 179 U. S. 328, 21 Sup. Ct. 125, 45 L. Ed. 214; Brannon on Fourteenth Amendment. p. 233; *Barbier v. Connolly*, 113 U. S. 27, 5 Sup. Ct. 357, 28 L. Ed. 923. Justice Field in discussing the amendment and its operation in the case of *Barbier v. Connolly, supra,* says:

"Though in many respects, necessarily special in their character, they do not furnish just ground of complaint if they operate alike upon all persons and property under the same circumstances and conditions. Class legislation, discriminating against some and favoring others, is prohibited; but legislation which, in carrying out a public purpose, is limited in its application, if within the sphere of its operation it affects alike all persons similarly situated, is not within the amendment."

Brannon, in his work entitled "The Fourteenth Amendment," *supra,* says:

"An act requiring such registry as a prerequisite to vote does not deprive a citizen of the United States of his privileges, contrary to the fourteenth amendment. The state prescribes the qualification of voters, and makes regulations for elections."

We are not unaware that some of the courts have held that a legislative requirement of registration is an unwarranted addition to the constitutional qualifications in order that the right to vote may be enjoyed; but, in view of the fact that our Constitution specifically provides that the Legislature shall make all such regulations as may be necessary to detect and punish fraud and to preserve the purity of the ballot, and that under this and the following proviso, "that registeration may be required in cities of the first class," we hold that it was no infraction of the rights of the plaintiffs herein to require the registration of the voters in the first class city of Pond Creek, and to permit none but such as were duly registered, or those coming within the exceptions of the act, to vote.

Under this same head it is further urged that the act is void because of the qualifications required of the persons who constituted the special election board and also the special election commissioners. The sections thereof which are drawn into question are sections 6 and 9, reading as follows:

"Sec. 6. When an election is called for the purpose of selecting a permanent location for a county seat, the Governor of the state shall appoint some person, resident of the county, who does not live or reside in either city or town which is a candidate for said honors, and each of said rival towns is to select one person each who shall constitute said election board, with duties as provided by law for county election boards, when not in conflict herewith. Said appointments of said members of said special election board shall be made upon the recommendations of the mayor or of the president of the town board of trustees, or in the event said place has neither, then upon the recommendation of the president of the organization representing said place, so being a candidate for the location of said county seat of said county. It shall be the duty of such special election board to prepare and cause to be prepared, and to distribute ballots for said election as provided by law for general elections; said ballots to contain the names of each and every city, town or place as certified to said board by the Governor of the state. The members of said board shall serve without compensation."

"Sec. 9.  No person shall be qualified and eligible to perform the duties of special election commissioner in any county, who shall be, or have been, a resident of such county, or who shall be interested in any manner in the success of any city, town or place which is a candidate for any such county seat, or who shall be interested in any way or in any manner in any business proposition or institution located in any such city, town or place which is a candidate for the permanent location of said county seat."

It is also contended that the Legislature was without constitutional authority to provide for the appointment of either the special election board, contemplated by section 6, or the special election commissioner, provided for by section 9.

Attention is once more directed to section 6 of article 3 of the Constitution, under which it is provided, as is seen above, "that the Legislature shall make all regulations as may be necessary to detect and punish fraud and preserve the purity of the ballot," and there is left no room for doubt as to the purposes of the Legislature in the passage of these provisions, when we consider the intents and fervent interest which is engendered by elections of this character.  In this connection we regard it not inappropriate to notice the historical knowledge, common to all, that the settlement of the county seat contests throughout the middle western portion of the United States has unfortunately very often been attended by duress, fraud, and bloodshed, and that the determination of the controversy arising over the location of the seat of government of a county appears to involve a condition which induces men, otherwise honest, responsible, upright, and law-abiding, to do things which they would commit under no other circumstances.  *State ex rel. Mitchell v. Stevens,* 23 Kan. 456. Under the laws which exist in the states surrounding us, wherein each community was permitted, under the general election laws of the state, to select its passion-heated members for election officials, all of the worst elements of human nature have been developed and given play.  All of this must have been known to the members of the Legislature which passed this act, and it was no doubt with the hope and the intention, when section 6 was adopted, that

by the appointment by the Governor, the highest executive official of the state, of a person not a resident of either city or town which was a candidate, and under it providing for the right of each of the rival towns to select a representative, who, acting together, and each protecting to the fullest extent his own and the rights of all, would result in guaranteeing to the citizens of the county and of the contesting communities equal and exact impartiality in the administration of the affairs of the election. And certainly such an idea prompted the Legislature in the passage of section 9, which provided that the special election commissioner of each precinct, who was charged with the duty of inspector, should come from a place out of the county, thereby to the extent of human ability securing absolute impartiality and fairness in the precincts. All of these things provided for by the Legislature must have been considered necessary to preserve the purity of the ballot, and surely such legislative action ought not to be set aside, except for reasons we believe to be lacking here. We hold their passage to be the legitimate exercise of legislative discretion, entirely within its power.

Nor can we say that in the case at bar its exercise failed to produce a most salutary effect. Nowhere in the allegations of the petition nor in the history of this case does there appear any allegation of fraud, duress, or violence. Not only do we hold the law to be constitutional, but a most salutary and beneficent one. Under it the purity of the ballot has been preserved, and a most exacting and trying period to the citizens of Grant county has passed without violence, without fraud, and in that law-abiding tranquility which is the triumph of popular government.

We have endeavored to cover all the main propositions raised by counsel in their briefs and oral arguments, and having considered all of the incidental objections, and finding no merit in the same, the demurrer to the petition is sustained.

All the Justices concur.